**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TAYLOR PETTIT, Individually and as Administrator of the ESTATE OF KENNETH PETTIT 306 Governors Drive Wallingford, PA  19086 | : : : : : : |
| *Plaintiff* | : Docket No.: : : |
| v. | : : |
| CHESTER COUNTY 313 West Market Street West Chester, PA  19380 | : **JURY TRIAL DEMANDED** : : : |
| and | : : |
| CORRECTIONAL OFFICER S. PATE c/o CHESTER COUNTY PRISON 501 S. Wawaset Road West Chester, PA 19382 | : : : : : |
| and | : : |
| CORRECTIONAL OFFICER D. ROBERTS c/o CHESTER COUNTY PRISON 501 S. Wawaset Road West Chester, PA 19382 | : : : : : : |
| and | : : |
| CORRECTIONAL OFFICER T. ROST c/o CHESTER COUNTY PRISON 501 S. Wawaset Road West Chester, PA 19382 | : : : : : |
| and | : : |
| LIEUTENANT KENNETH L. BOYD c/o CHESTER COUNTY PRISON 501 S. Wawaset Road West Chester, PA 19382 | : : : : |

CORRECTIONAL OFFICERS                  :
JOHN/JANE DOES (1-10) (fictitious)     :
c/o CHESTER COUNTY PRISON              :
501 S. Wawaset Road                    :
West Chester, PA 19382                 :
                                       :
   and                  :
                                       :
PRIMECARE MEDICAL, INC.                :
3940 Locust Lane                       :
Harrisburg, PA 17109                   :
                                       :
   and                  :
                                       :
MABEL MOIYALLA, MA                     :
c/o PRIMECARE MEDICAL, INC.            :
3940 Locust Lane                       :
Harrisburg, PA 17109                   :

   and

KIMBERLY MCGEE, LPN
c/o PRIMECARE MEDICAL, INC,
3940 Locust Lane
Harrisburg, PA 17109

   and

MEDICAL PROVIDERS
JOHN/JANE DOES (1-10) (fictitious)
c/o PRIMECARE MEDICAL, INC.
3940 Locust Lane
Harrisburg, PA 17109

Defendants

## **COMPLAINT**

### **THE PARTIES**

1.      Plaintiff, Taylor N. Pettit, is an adult individual residing at 306 Governors Drive,

Wallingford, PA  19086.

2.      On October 21, 2021, Plaintiff was granted Letters of Administration by the Register of Wills Office of Chester County, Pennsylvania to act as the Administratrix of the Estate of Kenneth Pettit, her deceased father ("Pettit").

3.      Pettit was born on August 12, 1976 and hung himself to death on October 6, 2021 while an inmate at Chester County Prison ("CCP"), a county prison located on 501 S. Wawaset Road in West Chester, Pennsylvania.  Having just turned 45 years old, he was survived by Plaintiff (his elder daughter residing at the above-captioned address) and his younger daughter Kiley Pettit (residing at 118 Locust Lane, Exton, PA 19341).

4.      Defendant Chester County ("the County") is a municipality within the Commonwealth of Pennsylvania, located at 313 West Market Street, West Chester, PA 19380. At all relevant times, the County owned and operated CCP and employed the Officer Defendants identified below.

5.      Defendant Correctional Officer S. Pate ("CO Pate") was, at all relevant times, a Correctional Officer at CCP, acting under the color of law and within the course and scope of his employment with the County.  His full first name is unknown and his badge number is believed to be #1113.

6.      Defendant Correctional Officer D. Roberts ("CO Roberts") was, at all relevant times, a Correctional Officer at CCP, acting under the color of law and within the course and scope of his employment with the County.  His full first name is unknown and his badge number is believed to be #1161.

7.      Defendant Correctional Officer T. Rost ("CO Rost") was, at all relevant times, a Correctional Officer at CCP, acting under the color of law and within the course and scope of his

employment with the County.  His full first name is unknown and his badge number is believed
to be #1177.

8.      Defendant Lieutenant Kenneth L. Boyd ("Lt. Boyd") was, at all relevant times, a
Lieutenant at CCP, acting under the color of law and within the course and scope of his
employment with the County.

9.      Defendant Correctional Officers John/Jane Does (1-10) were correctional officers
or supervisors employed by the County to work at CCP.  Plaintiff does not presently know the
names of these defendants after conducting a reasonable search, including a review of pre-
complaint discovery produced by the County.  Plaintiff expects to learn the names of these
additional correctional officers and/or supervisors through formal discovery and will promptly
take steps to substitute actual names for these fictious names.[1]

10.     Defendant PrimeCare Medical, Inc. ("PrimeCare") is an active Pennsylvania
corporation with a principal place of business at the above-captioned address which, at all
relevant times, was under contract with the County to provide medical care, including psychiatric
and mental health services, to CCP prisoners such as Pettit.  Upon information and belief, at all
relevant times, PrimeCare employed the Medical Defendants identified below.

11.     Defendant Mabel Moiyallah, MA, ("Assistant Moiyallah") was, at all relevant
times, a medical assistant who was working at CCP, acting under the color of law and within the
course and scope of her employment and/or agency with PrimeCare.

12.     Defendant Kimberly McGee, LPN ("Nurse McGee") was, at all relevant times, a
licensed practical nurse who was working at CCP, acting under the color of law and within the
course and scope of her employment and/or agency with PrimeCare.

---

[1] The County, CO Pate, CO Roberts, CO Rost, Lt. Boyd, and Correctional Officers John/Jane Does (1-10) are
hereinafter collectively referred to as the "Officer Defendants".

13.     Defendant Medical Providers John/Jane Does (1-10) were doctors, nurses, or other medical providers working at CCP as employees and/or agents of PrimeCare.  Plaintiff does not presently know the names of these defendants after conducting a reasonable search, including a review of discovery produced by PrimeCare.  Plaintiff expects to learn the names of these additional medical providers through formal discovery and will promptly take steps to substitute actual names for these fictious names.[2]

14.     At all relevant times, the County and PrimeCare were acting, or alternatively failed to act, by and through their employees, agents, and/or ostensible agents, who were acting within the course and scope of their employment, agency, and/or ostensible agency.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction of this action over all Defendants pursuant to 42 U.S.C. § 1983 as well as 28 U.S.C. § 1331.  This Court has jurisdiction over the pendant state tort law claims pursuant to 28 U.S.C. § 1367(a).

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to Plaintiff's claims took place here, as did Pettit's suicide.

## FACTUAL BACKGROUND

17.     Long before he hung himself on October 6, 2021, Pettit's mental health issues and troubled history were well known to both the County and PrimeCare.

---

[2] PrimeCare, Assistant Moiyallah, Nurse McGee, and Medical Providers John/Jane Does (1-10) are hereinafter collectively referred to as the "Medical Defendants".  Plaintiff is asserting, *inter alia*, a professional negligence claims against the Medical Defendants and is filing herewith the appropriate Certificates of Merit in accordance with Pennsylvania Rule of Civil Procedure 1042.3 (collectively attaching the Certificates as Exhibit A hereto).

18.     According to County and PrimeCare records, on April 21, 2021, Pettit was committed to CCP as a pretrial detainee.  Upon information and belief, Pettit had been there before.

19.     Upon intake, he revealed a history of cocaine and marijuana use.  PrimeCare's intake forms reflected, *inter alia*: (a) significant loss within the last 6 months; (b) patient's family or significant other has attempted or committed suicide [Pettit's father hung himself to death when he was younger, as reflected in PrimeCare records]; (c) a previous commitment (date and location not reflected); and (d) head injury years prior.

20.     On April 24, 2021, Pettit's cellmate reported that Pettit "had a sheet around his neck and was trying to kill himself."  The responding officer, Officer Manyeah, found a sheet that had been "twisted tightly to mimic a noose".

21.     According to a report from Corporal King, Pettit stated "I can't do this anymore." His cellmate advised Cpl. King that Pettit again tried to tie something around his neck after the sheet was removed.  Cpl. King escorted Pettit to the medical department, during which Pettit stated he "did not want to live anymore."

22.     Nurse McGee assessed Pettit in the medical department, at which time Pettit was sobbing, acknowledged his suicide attempt and reiterated "I can't do this anymore, I don't want to live anymore, …."  Nurse McGee placed Pettit on Psychiatric Observation Level 1.

23.     On April 25th, Nurse McGee noted that Pettit remained housed on "psych obs level 1" and asked for sleep medication.

24.     On April 26th, Nurse McGee noted that Pettit remained on level 1 and had refused vitals on rounds.

25.     On April 27th, Pettit was assessed by Angela O'Neill, PsyD, who noted: "Seems to minimize issues and overly positive at times that it presents ingenuine."  Dr. O'Neill noted "Opiate Use Disorder", assessed Pettit as a moderate risk of self-harm and stepped him down to suicide level 2, which she referred to as "SW L2".  She also referred Pettit to Psychiatry (though it does not appear that the appointment ever occurred).

26.     On April 28th, Nurse McGee noted that Pettit again refused vitals on rounds. Psychologist O'Neill noted that Pettit seemed overly positive, labeled him a "hypomanic", and scored him a "C" on the A-D Mental Health Stability Rating ("MHSR").

27.     On April 29th, Nurse McGee noted that Pettit was observed and monitored on "psych obs level 2."  Kyle Morrison, PsyD assessed Pettit and shared the concern that he was "overly positive at times that it presents ingenuine."  Given Pettit purported belief that suicide was immoral and protective factors including two children and a desire to return to work, Dr. Morrison assessed Pettit as a low risk of self-harm and stepped him down to PO L3 (Psychiatric Observation Level 3) after consultation with Dr. O'Neill.  He also referred Pettit to Psychiatry (though it does not appear that the appointment ever occurred).

28.     On April 30th, Nurse McGee noted that she monitored Pettit twice that morning. According to PrimeCare records, Pettit remained on Level 3 "Suicide Watch" until it was discontinued on May 3rd by Dr. O'Neill, who assessed Opiate Use Disorder, R/O mood and bipolar disorders and planned for 24-hour suicide watch follow-ups.

29.     Pettit was released the next day.

30.     On October 2, 2021, Pettit was recommitted to CCP, at which time an intake and suicide screening was performed by Assistant Moiyallah.  She noted Pettit's history of drug or alcohol abuse and prior commitment to CCP but, unlike on that intake, recorded "No" in

response to whether patient's family or significant other has attempted or committed suicide.  In addition, though in direct conflict with PrimeCare's own records referencing the aforementioned suicide attempt, she inexplicably recorded "No" in response to whether "Patient has attempted suicide previously" and to the question: Do you have a history of suicide attempts? Assistant Moiyallah scheduled Pettit for a 14-day Physical (10-12-2021) and 90 day Mental Health Assessment (12-31-2021).

31.     Within minutes of the intake, Nurse McGee reviewed the intake forms.  She noted his suicide score was 1 (for a history of substance abuse) and that Pettit was cleared for general population.  Pettit signed a Consent form authorizing PrimeCare to provide and receive his medical records.  He was placed in Cell N47.

32.     Upon information and belief, other than a negative COVID test, Pettit received no medical attention (mental health, detoxification, or otherwise) before hanging himself to death four days later as alleged below.

33.     Upon information and belief, his "activity" was reflected on an Intake Checklist at 30-minute intervals.

34.     According to a CCP telephone log, Pettit made 16 calls between October 2nd and October 6th, 14 to his girlfriend Danielle and 2 to his brother Bobby, during which Pettit's financial, legal, and mental health problems were discussed.  All such calls were recorded.

35.     Notably, on his first call during the October detainment, he told Danielle "I'm done with life…I think I'm just going to quit life."

36.     On October 4th, he told Danielle that he was "about to kill myself earlier…barely holding on."

37.     On October 6th, five hours before his suicide, Pettit told Danielle that he was "barely holding it together."

**THE SUICIDE**

38.     According to CCP reports, there were four inmates on N block as of the afternoon and/or early evening of October 6th.

39.     Pettit was the lone occupant of cell N-47.  On video produced by CCP, Pettit is last seen out of his cell around 4:45 pm, at which time he placed a food tray on a nearby table and immediately retreated into his cell.

40.     That same video reflects a Correctional Officer, believed to be CO Pate, walking by Pettit's cell shortly before 5 pm.  CO Pate wrote "laying" as the observed activity at that time.

41.     Pettit was not observed, as he should have been, around 5:30 pm, and his Intake Checklist does not have an entry at that time.

42.     According to CCP incident reports, CO Pate was assigned to the 1545 to 0015 shift (essentially 4 to midnight), along with CO Roberts and CO Rost.

43.     The reports indicate that CO Pate went on a half-hour dinner break around 5:30 pm.  It is unknown what CO Roberts and CO Rost did during that timeframe.

44.     CO Pate reported that, upon returning from break, he repeatedly rang via intercom into Pettit's cell to see if Pettit wanted to go to the "dayroom".   Pettit did not respond on all 3 occasions.

45.     Hearing no response from Pettit, CO Pate rang in on the other three inmates on the block.  He then rang Pettit again but got no response.  CO Pate then entered the quad and can be seen walking over to Pettit's cell on the video, at approximately 6:07 pm.

46.     CO Pate reported that when he arrived to the cell window he saw Pettit's legs and torso slumped over off the bunk, appearing to hang.  On the video, CO Pate can be seen for approximately 30 seconds opening the cell door and standing by the door front (but not entering the cell).  He then left for 20 seconds before returning.

47.     The same video shows CO Roberts arriving around a minute after CO Pate first arrived, leaving 30 seconds later, and returning approximately 30 seconds thereafter.

48.     According CO Pate's report, he and CO Roberts entered the cell together, at which time he saw Pettit hanging from a sheet tied around the top bunk.  At CO Pate's instruction, CO Roberts retrieved scissors and returned to cut Pettit down.  CO Roberts reported that he called CO Rost over the radio to call a Code 2.

49.     The first medical responder can be seen on video arriving to Pettit's cell at approximately 6:10 pm, 2-3 minutes after CO Pate discovered Pettit hanging.

50.     According to his report, Lt. Boyd was the floor lieutenant on that 4-12 shift.  He responded to the Code and ordered a 911 call at 6:13 pm.

51.     EMS arrived around 6:25 pm and assumed CPR.  They could not resuscitate Pettit and he was pronounced at 7:57 pm, cause of death asphyxiation and hanging.

52.     According to the autopsy report, Pettit was last seen alive at approximately 4:54 pm, and demonstrated rigor mortis upon external examination.

## PREVALENCE OF INMATE SUICIDES AND ATTEMPTED SUICIDES

53.     Unfortunately, Pettit's suicide was far from an isolated incident.

54.     Although statistics are unknown, Pettit was certainly not the only suicide victim housed at CCP (and most certainly not the only suicide victim housed in a prison serviced by PrimeCare), let alone attempted suicide victim.

55.     For example, Donald Weiss and Jason Walling hung themselves to death in their CCP cells in 2002 and 2015, respectively, and, in 2010, Robert Stewart became a quadriplegic following an attempted suicide.  Walling committed suicide a year after the County announced that it renewed its contract for PrimeCare to provide health care services to CCP, which it had done since the 1990s.

56.     In February of 2019, WHYY.org published an article titled "*81 Pa. county jail suicides in 4 years: A look at how jails report deaths*".  In addition to the 81 reported suicides between 2015 and 2018 in Pennsylvania county jails, (including that referenced above at CCP), there were a staggering 715 suicide attempts during the same 4 year period.  The article cited to a 2015 report from The Marshall Project titled "*Why Jails Have More Suicides than Prisons*", proffering that those confined in jails have a higher rate of mental illness and that a jail's intake protocols are not under the same microscope as in state prisons.

57.     The widespread prison suicide problem, far beyond just CCP, has been well publicized for years now.  In a February 20, 2020 Philadelphia Inquirer article titled *Pennsylvania prison suicides are at an all-time high.  Families blame 'reprehensible' medical-health care*, Christine Tartaro, a professor of criminal justice at Stockton University, is quoted as saying: "Suicide is very preventable in prison and jail systems…Increases in institutional suicides are often tied to insufficient psychiatric screening and inadequate mental-health staffing levels".

58.     According to statistics provided by PrimeCare to the CCP Board, in 2021, there were 3 deaths, including one in June.  There were 634 patients on suicide watch on 1569 seen by a psychiatrist.  In the month of October alone, there were 51 patients on suicide watch, 51 "Seriously Mentally Ill", and 103 seen by a psychiatrist.  Shockingly, Pettit was not one of them.

59.     During a Prison Board meeting which occurred on October 28, 2021, three weeks after Pettit's suicide, a CCP correctional officer spoke anonymously during the public comment section of the meeting.  She voiced concerns regarding a high turnover rate, insufficient pay, low morale, and being "extremely understaffed", such that the prison was "not being run safely."

60.     Commissioner Josh Maxwell responded that her concerns were "on our minds, specifically regarding staffing."  Warden Ron Phillips, acknowledging 49 vacancies including 32 at the CO level, responded that "we don't disagree with anything" and the same concerns "we have each and every day."

## PATTERN AND PRACTICE OF CONSTITUTIONALLY DEPRIVING PRISONERS WITH SERIOUS MENTAL ILLNESS

61.     Long before the County and PrimeCare allowed Pettit to end his life in their custody, they were well aware of their failures to appropriately treat numerous prisoners like Pettit suffering from mental illness and substance abuse.

62.     In fact, several of the above-refenced non-Pettit incidents culminated in lawsuits against the County, PrimeCare, and their representatives: Weiss's estate filed a lawsuit which was settled in 2006 [Case:2:04-cv-00665] and Robert Stewart filed a lawsuit which was settled in 2014 [Case:2:12-cv-01509].

63.     In addition to alleging deliberate indifference and medical negligence, both lawsuits brought *Monell* based claims (e.g. failure to train, supervise, and maintain policies).

64.     Similarly, in 2016, the Estate of Rae-Mone Carter settled a lawsuit against the County, PrimeCare, and others stemming from his death while incarcerated at CCP [Case 5:13-cv-04667].  Although his death related to untreated diabetes (as opposed to a suicide or serious

mental illness), the lawsuit, as with the Weiss and Stewart lawsuits, alleged not just deliberate indifference and medical negligence but also a lack of policies and procedures.

65.     In addition to these publicly filed lawsuits, Defendant PrimeCare's unconstitutional patterns and practices have been the subject of numerous news articles.

66.     For example, in an April 8, 2015 article from MintPress News titled *Did Prison Contractor PrimeCare Cause Pennsylvania Inmate Deaths?*, two particular lawsuits involving Lehigh County deaths were discussed.  Notably, the article stated: "The stories outlined in these complaints line up perfectly with those coming out of other jails that have outsourced their medical care to companies like PrimeCare and other private inmate medical contractors, across the country. In almost every case, an individual's most basic health needs are unarguably unmet as their condition visibly deteriorates. Many times the complaints involve shocking stories of negligent or malicious behavior on behalf of medical staff who probably should have never been working there in the first place. It is at that point only — the point of no return for far too many inmates — that the private medical company finally springs into action, sending the inmate off to emergency rooms where many die or go on to suffer from lifelong injury."

67.     A December 13, 2021 article published by *Pennlive.com*, focusing on PrimeCare, stated that it was a named defendant in 18 federal lawsuits filed in Pennsylvania in 2021 alone. The article quoted Alexandra Morgan-Kurtz, managing attorney for the nonprofit Pennsylvania Institutional Law Project, as labeling healthcare in county jails "pretty abysmal".  According to Morgan-Kurtz, for-profit companies like PrimeCare under flat fee contracts with the counties have "significant financial incentives to not provide robust medical care" – the more services provided the less profits made.  The article also cited a 2020 analysis by Reuters, finding that

county jails relying on private medical providers like PrimeCare had a higher death rate than those that used public providers.

68.     In a recent May 1, 2022 Prison Legal News article titled *PrimeCare: Less Medical Care for Prisoners, Higher Expenses for Taxpayers, More Profits for Corporate Owner*, a litany of wrongful death and suicide related lawsuits were discussed.  According to the article, 26 lawsuits were filed against PrimeCare since 2009 stemming from inadequate prison medical care, 9 of which were suicide related and 6 of which settled between November 2017 and November 2019 for nearly $14 million (with 5 other cases settling for undisclosed amounts). The author concluded: "For companies like PrimeCare, their fundamental business model is to get as much money from the government and then provide as little medical care as possible."  In particular, the article referenced the following notable lawsuits:

- *Reilly v. York City*, (M.D. Pa. Case 18-01803) – 2016 hanging settled in 2021

- *Beers v. Cnty. of Northumberland* (M.D. Pa. Case 14-02349 – 2013 hanging settled 2016

- *Lewis v. Cnty. of Northumberland* (M.D. Pa. Case 14-02126) – 2014 suicide settled 2019

- *Ponzini v. Monroe Cty.*, 789 Fed. Appx. 313 (3d Cir. Nov. 2019) – 2009 suicide led to an $11.9 million verdict against PrimeCare and others in 2016, including an $8 million punitive damages award reinstated by the Third Circuit approximately 6 months before the Pettit suicide

- *Flyte v. Cty. of Northampton* (E.D. Pa. Case 19-00703) - 2017 hanging settled 2019

- *Applegate v. Cty. of Northampton* (E.D. Pa. Case 17-03885) - 2015 suicide settled 2019

- *Schnee v. Berks Cty.* (E.D. Pa. Case 14-03195) – 2013 suicide settled 2016

- *Freitag v. Bucks Cty.* (E.D. Pa. Case 19-05750) – 2018 suicide case pending

- *Stewart v. Emmons* (E.D. Pa. Case 12-01509) – 2010 suicide attempt settled 2014

- *James v. Monroe Cty.* (W.D. N.Y. Case 20-07094) – 2018 hanging case pending

69.     Despite numerous and repeated inmate suicides and suicide attempts over the years, the County and PrimeCare failed to create, implement and/or enforce the necessary policies and customs to protect civil rights of CCP prisoners, thereby establishing a custom of violating civil rights of those within their custody and control.

70.     The County failed to adhere to the **Mission Statement** stated on its website: *The mission of the Chester County Prison is to ensure the public, as well as the correctional staff, a safe environment that provides detention, rehabilitative, recidivism risk reduction, and re-entry services to those who are incarcerated so that they may live in a clean, humane, and secure environment and re-enter the community as a productive citizen..*

71.     And PrimeCare failed to adhere to its Vision Statement: "*PrimeCare Medical, Inc. is committed to managing and reducing risk in correctional healthcare by providing cost-effective quality healthcare management, continuously improving the standards of care, and striving for national accreditation for all facilities. Dedicated to correctional healthcare, PrimeCare Medical prides itself on our strong client relationships, effective and efficient management of healthcare services. These attributes continue to be the hallmark of our success.*"

72.     Egregious and rampant failures on the part of the Officer Defendants and the Medical Defendants led to Pettit's tragic and preventable suicide.

73.     Plaintiff now seeks recovery from all Defendants for the catastrophic and fatal injuries, damages, and economic losses suffered by Pettit and his daughters, as more fully described below.

## COUNT I - VIOLATION OF CIVIL RIGHTS (14TH AMENDMENT)
## PLAINTIFF v. DEFENDANTS

74.     Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

75.     At all relevant times, Defendants, acting under color of law, were deliberately indifferent to Pettit's serious medical needs in violation of the Fourteenth Amendment's ban on cruel and unusual punishment.

76.     In particular, Defendants were deliberately and recklessly indifferent to Pettit's vulnerability to suicide, which they each knew or should have known about on or before October 6, 2021.

77.     For months, Defendants possessed actual knowledge of Pettit's failed suicide attempt -- at CCP, serious mental illness, repeated and ongoing drug addictions and withdrawals, and father's suicide -- all of which amounted to telltale suicide risks.

78.     Despite such knowledge, Defendants ignored, if not exacerbated, Pettit's obvious suicidal propensities and failed to take necessary and available precautions which would have saved his life, such as housing him in the appropriate observation unit and/or with a cellmate; providing the appropriate diagnoses and treatments, including medications, counseling, and trained medical and mental health professionals including a Psychiatrist; obtaining and reviewing their own prison and medical records from Pettit's April 2021 detainment; ensuring that he was observed at all times or at least at regular intervals; accurately documenting such observations; properly assessing his suicide risk; denying him a means to commit suicide (i.e. placing him alone in a cell with a bedsheet and an elevated bedframe); and rendering aid immediately and emergently once Pettit started hanging.

79.     At a minimum, Defendants were duty bound to follow well established suicide prevention standards and guidelines, the collective purpose of which was to protect and enhance the mental health of inmates such as Pettit.

80.     The 2014 Standards for Health Services in Jails and 2015 Standards for Mental Health Services for Correctional Facilities, promulgated by the National Commission on Correctional Health Care, contain a **SUICIDE PREVENTION PROGRAM** (Section J-G-05 and Section MH-G-04, respectively).  The Program established, *inter alia*:

- *Nonacutely suicidal* inmates should be placed on suicide precautions and observed at staggered intervals not to exceed every 15 minutes (e.g. 5, 10, 7 minutes), with unpredictable, documented supervision maintained;

- Patients are reassessed regularly to identify any change in condition indicating a need for a change in supervision level or required transfer or commitment.  The evaluation includes procedures for periodic follow-up assessment after the individual's discharge from suicide precautions;

- Treatment strategies and services to address the underlying reasons (e.g. depression) for the inmate's suicidal ideation are to be considered, including treatment when the inmate is at heightened risk as well as follow-up interventions and monitoring to reduce the likelihood of relapse;

- Procedures for communication between mental health care, health care, and correctional personnel regarding inmate status are in place to provide clear and current information; and

- Housing.  Unless constant supervision is maintained, a suicidal inmate is not isolated but is housed in the general population, mental health unit, or medical infirmary, and located in close proximity to staff.  All cells or rooms housing suicidal inmates are as suicide-resistant as possible (e.g., without protrusions of any kind that would enable hanging).

81.     In addition, the 2015 Standard contained Section MH-E-09 **CONTINUITY AND COORDINATION OF MENTAL HEALTH CARE DURING INCARCERATION**, mandating that all aspects of an inmate's mental health care are coordinated and monitored

throughout the inmate's incarceration, in accordance with written policy and defined procedures. In relevant part, the Standard stated:

> When an inmate returns from a psychiatric hospitalization, urgent care, or emergency department visit that pertains to mental health, a mental health professional sees the patient, reviews the discharge orders, and issues follow-up orders as clinically indicated.
> …
> When delays or long wait times for specialty appointments occur, mental health staff should take intermediate care measures (e.g. placement in an observation cell) to monitor the inmate's mental status while waiting for these appointments.

82.     Defendants' failure to treat, monitor, and address Pettit's legitimate and serious medical needs transcended contemporary standards of decency, are shocking to the conscience of mankind, and violated his Fourteenth Amendment right to be free from cruel and unusual punishment.

83.     Defendants' unreasonable, egregious, malicious, willful, and intentional acts and omissions constitute a deliberate indifference and callous disregard for Pettit's life, safety, and well-being.

84.     As a direct and proximate result of Defendants' unlawful and unconstitutional behavior, Pettit suffered serious bodily harm and death, and Pettit and his parents suffered other catastrophic damages as set forth below.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for wrongful death and survival damages, compensatory and punitive damages in an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such other relief as the Court deems just and proper.

## COUNT II - VIOLATION OF CIVIL RIGHTS (*MONELL* CLAIMS)
## PLAINTIFF v. THE COUNTY AND PRIMECARE

85.     Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

86.     The violations of Pettit's constitutional rights as set forth above were directly and proximately caused by the deliberate indifference of the County and PrimeCare to the need for hiring, training, supervision, investigation, monitoring, and/or discipline with respect to the provision of specialized medical care to inmates such as Pettit, under their custody and control.

87.     The violations of Pettit's constitutional rights as set forth above were directly and proximately caused by the encouragement, tolerance, ratification of, and deliberate indifference of the County and its private mental health provider to the policies and practices of their agents and employees of refusing, delaying, interfering with, or negligently providing timely and appropriate medical care and treatment to those in special need like Pettit.

88.     The violations of Pettit's constitutional rights as set forth above were directly and proximately caused by the abject failure of the County and its private mental health provider, with deliberate indifference, to develop, implement, update, and/or enforce policies and practices to ensure that inmates like Pettit received timely, necessary, and appropriate medical care for serious mental illness and critical life saving measures.

89.     On and well before October 6, 2021, the County and its private mental health provider knew or certainly should have known of the need to improve and correct failed hiring, training, supervision, investigation, monitoring, discipline, policies, and practices by virtue of, *inter alia*, a laundry list of other suicides and suicide attempts, published statistics and news articles, and other similar lawsuits, alleged above.

90.     The above referenced failures proximately caused Pettit's serious bodily injuries and death in that they directly and in natural and continuous sequence produced, contributed substantially, or enhanced such injuries and death.

91.     The aforementioned acts and/or omissions constitute willful and wanton misconduct in disregard of the rights, health, well-being, and safety of Pettit, to his detriment and that of his daughters.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for wrongful death and survival damages, compensatory and punitive damages in an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such other relief as the Court deems just and proper.

## COUNT III – MEDICAL NEGLIGENCE (STATE LAW)
## PLAINTIFF v. MEDICAL DEFENDANTS

92.     Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

93.     At all relevant times, the Medical Defendants were, upon information and belief, licensed to practice medicine in the Commonwealth of Pennsylvania, and had a duty to comply with generally accepted medical and mental health standards of care in their medical treatment of Pettit.

94.     The Medical Defendants violated their duty of care to Pettit and were careless, negligent, and reckless in the following respects:

    a.     Failure to timely and accurately recognize, diagnose, and treat Pettit's medical condition, including serious mental illness;

    b.     Failure to timely and accurately diagnose Pettit's behavior as suicidal and not just self-serving;

    c.     Failure to perform a structured suicide risk assessment and reassessment on a timely and accurate basis;

    d.     Failure to implement and maintain an intense and appropriate treatment plan to minimize the risk of suicide;

    e.     Failure to render proper and timely treatment and care to Pettit, including on an emergency/stat basis as required under the circumstances;

f.      Failure to obtain timely and appropriate consultation from specialists, including psychiatrists and psychologists;

g.      Failure to ensure that Pettit's psychiatry appointments scheduled in April 2021 were not canceled;

h.      Failure to timely and appropriately prescribe and administer necessary medications;

i.      Failure to provide appropriate and effective detox treatment to address Pettit's drug addictions and withdrawal;

j.      Failure to provide necessary medical information to Pettit about the care he required and providing incomplete and incorrect information to him regarding his care, both in April and October of 2021;

k.      Failure to provide necessary, complete, and correct medical information to other medical professionals caring for Pettit about the care he required and/or was provided;

l.      Failure to timely appreciate the grave danger he was in and take seriously his prior and recent suicide attempt at CCP, which led to repeated treatment by Nurse McGee in particular;

m.      Failure to timely appreciate Pettit's changes in mental status, mood swings, and sleeplesssness;

n.      Failure to house Pettit in the appropriate housing unit and/or with a cellmate, which was critical to saving his life the first time;

o.      Failure to ensure that Pettit was placed on Suicide Watch and/or Psychiatric Observation and properly observed at documented, regular intervals, per standards, guidelines, and orders;

p.      Failure to ensure that Pettit was not provided with the means to hang himself – a bedsheet and elevated bedframe readily accessible while in his cell alone;

q.      Failure to prevent Pettit from firmly attaching his bedsheet to the top of the bedframe, and creating a noose;

r.      Failure to timely and appropriately respond by immediately initiating a Code Blue when Pettit was hanging in his cell;

s.      Failure to ensure that Pettit possessed an anti-suicide smock and blanket at all relevant times;

t.    Failure to ensure that others, including supervisors, were timely and appropriately notified when Pettit had access to the means of suicide;

u.    Failure to timely obtain and review Pettit's prior prison and mental health records from his April 2021 detainment;

v.    Failure to accurately complete forms upon intake in October, including but not limited to questions concerning Pettit's father's suicide and his own failed suicide attempt – while at CCP;

w.    Failure to heed and appropriately respond to Pettit's cries for help, as can be heard on recorded phone calls to his girlfriend (referenced above);

x.    Failure to follow appropriate suicide related training and policies; and

y.    Entrusting Pettit's care to individual(s) who it should have known would perform his/her/their duties in a negligent and/or reckless manner.

95.    The Medical Defendants' violation of their duty of care, in reckless and wanton disregard for Pettit's safety and well-being, increased the risk of harm to Pettit and was a direct and proximate cause and substantial factor in bringing about Pettit's serious bodily injuries and death.

96.    To the extent that the individual Medical Defendants were acting as employees, agents and/or ostensible agents of PrimeCare, acting within the scope and course of their employment, agency, and/or ostensible agency, PrimeCare is vicariously liable to Plaintiff.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for wrongful death and survival damages, compensatory and punitive damages in an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's fees and such other relief as the Court deems just and proper.

## FIRST CAUSE OF ACTION - WRONGFUL DEATH
## PLAINTIFF V. DEFENDANTS

97.    Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

98.    Plaintiff is the legal representative of the Estate of Kenneth Pettit.

99.    Plaintiff brings this action by virtue of 42 Pa. C.S.A. §8301 and Pennsylvania Rule of Civil Procedure 2202 and claims all benefits of the Wrongful Death Act on behalf of herself and all other persons entitled to recover under the law, including her sister, Kiley Pettit.

100.    By reason of Pettit's tragic death, his Administratrix and/or his beneficiaries have suffered pecuniary losses and seek recovery of all medical, funeral, and administration expenses incurred as well as lost support, comfort, society, companionship, guidance, solace, protection and other services Pettit would have provided during his lifetime.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for wrongful death and survival damages, compensatory and punitive damages in an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest, costs, attorney's  fees and such other relief as the Court deems just and proper.

## SECOND CAUSE OF ACTION - SURVIVAL ACTION
## PLAINTIFF V. DEFENDANTS

101.    Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

102.    Plaintiff brings this action on behalf of the Estate of Kenneth Pettit by virtue of 42 Pa. C.S.A. §8302 and claims all benefits of the Survival Act on behalf of herself and all other persons entitled to recover under the law, including her sister, Kiley Pettit.

103.    Plaintiff claims on behalf of Pettit all damages suffered, including, but not limited to, significant conscious pain and suffering, catastrophic and fatal physical injuries and mental anguish, great fright, scarring, disfigurement, embarrassment, humiliation, loss of ability to enjoy life's pleasures, as well as the loss of future earning capacity from October 6, 2021 onwards.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for wrongful death and survival damages, compensatory and punitive damages in

an amount in excess of One-Hundred and Fifty Thousand Dollars ($150,000.00), plus interest,

costs, attorney's fees and such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

In accordance with the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury

as to all counts and issues raised herein.

**EISENBERG, ROTHWEILER,
WINKLER, EISENBERG & JECK, PC.**

By:    s/Todd A. Schoenhaus               
          NANCY J. WINKLER, ESQUIRE
          TODD A. SCHOENHAUS, ESQUIRE
          1634 Spruce Street
          Philadelphia, PA 19103
          (215) 546-6636
          (215) 546-3641 fax
          Attorneys for Plaintiff

Dated: October 5, 2023